**In re Billy R. SKIPPER.**

**No. 6:01–bk–60089.**

United States Bankruptcy Court,
W.D. Arkansas,
Hot Springs Division.

Feb. 13, 2002.

John Ogles, Ogles Law Firm, Jacksonville, AR, for Debtor.

Frederick S. Wetzel, III, Little Rock, AR, U.S. Bankruptcy Trustee.

### Order Sustaining Objections to Exemptions and Granting Motion for Turnover

ROBERT F. FUSSELL, Bankruptcy Judge.

Pending before the Court are the objection to exemptions and motion for turnover filed on February 13, 2001 by Frederick S. Wetzel, III., (the "Trustee") the duly appointed chapter 7 trustee in this case, and

the objection to amended exemptions filed by the Trustee on May 16, 2001. Evidentiary hearings were held on the objection to exemptions, motion for turnover, and objection to amended exemptions on August 8, 2001 and September 6, 2001. At the conclusion of the hearings, the Court took the matter under advisement. For the reasons stated below, the Trustee's objections to exemptions are sustained and his motion for turnover is granted.

## I. *Jurisdiction.*

The Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a), and this is a core proceeding as defined by 28 U.S.C. §§ 157(b)(2)(B) and (E). This order constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052(a).

## II. *Findings of Fact.*

Billy R. Skipper ("Debtor") filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on January 26, 2001. Debtor's Amended Schedule B, "Personal Property," listed property described as an "IRA and College Fund" (the "IRA and Valic Fund"), with a current market value of approximately $19,000.00. Debtor's Amended Schedule C, "Property Claimed as Exempt," claimed an exemption of the IRA and Valic Fund in the amount of $16,150.00, pursuant to 11 U.S.C. § 522(d)(5).

On February 13, 2001, the Trustee filed an objection to exemptions and motion for turnover of property related to Debtor's claimed exemption of the IRA and Valic Fund. The Trustee's objection and motion asserted that the claimed exemption of $16,150.00 exceeded the $8,925.00 cap on Debtor's "wild card exemption" under 11 U.S.C. § 522(d)(5). On March 5, 2001,

Debtor filed a general denial of the allegations in the Trustee's objection and motion.

On March 9, 2001, the Court entered a scheduling order, which provided that the parties were to submit a written stipulation of facts by March 19, 2001. On March 21, 2001, the parties filed a stipulation of facts and documents that stated as follows:

1. The debtor filed his Chapter 7 case on January 26, 2001.

2. The debtor lists on his Schedule "B" an IRA and college fund valued at $19,000.00.

3. The IRS and college fund are an IRA account with Merrill Lynch invested in the Pioneer Investments Growth Fund ("IRA Account") and an Arkansas State Police Valic Fund ("Valic Fund").

4. Both the IRA and Valic Fund are in the debtor's individual name. Neither account shows the debtor holds the money as Trustee or in trust.

5. Before the debtor filed bankruptcy he contributed money to the IRA Account for his son's college education. The debtor also contributed all money in the Valic fund to pay for his son's college. Those contributions were made with the agreement of the debtor's ex-wife who was married to the debtor until June 2000.

6. The balance in the IRA Account is $14,445.43.

7. The balance in the Valic Fund is $5,528.51.

8. The debtor uses his social security number on the IRA account and Valic Fund for tax reporting purposes.

9. Exhibit "A" is the [statements of accounts] for the IRA Account.

10. Exhibit "B" is the Valic Fund documents.

11. The debtor claims his exemptions under 11 U.S.C. § 522(b)(1).

12. The debtor owns a home, but claims no real estate equity under 11 U.S.C. § 522(d)(1). The debtor is entitled to claim an exemption in the IRA Account and Valic Fund under 11 U.S.C. § 522(d)(5) in the amount of $8,925.00 if they are non-exempt.

On March 23, 2001, Debtor's counsel submitted two letters to the Court. In the first letter, he stated that "it is debtor's position that the two accounts are set up for debtor's son's college expenses." Debtor's counsel's second letter purported to be a "request by the debtor to amend his exemptions to include 11 U.S.C. § 522(d)(10)(E)."

On April 17, 2001, Debtor filed a motion to amend exemptions asserting that Debtor is entitled to exempt $8,925.00 of the IRA and Valic Fund pursuant to 11 U.S.C. § 522(d)(5), and that Debtor is entitled to exempt the remaining $11,048.94 of the IRA and Valic Fund pursuant to 11 U.S.C. § 522(d)(10)(E). On April 26, 2001, Debtor filed an Amended Schedule C, "Property Claimed as Exempt," in which he claimed exemptions of the IRA and Valic Fund in the amounts set forth in his motion to amend exemptions. The Trustee filed an objection to the amended exemptions on May 16, 2001.

Evidentiary hearings were held on August 8, 2001, and September 6, 2001. During the August 8, 2001 evidentiary hearing, Debtor testified that he is a forty-three year old retired officer of the Arkansas State Police. Debtor was a police officer for approximately twenty years, until his retirement on or about October 26, 2000. Debtor's Exhibit 1, a December 1, 2000 letter written by Paul L. Deyoub, Ph.D., stated that Dr. Deyoub performed a "Fitness for Duty Evaluation" on Debtor on October 2, 2000, and reached the conclusion that Debtor's "ability to perform his job as a trooper was compromised, due to the pain, the psychological distress, and the need to take narcotic pain medication." Based on those observations, Dr. Deyoub concluded that Debtor's "medical and psychological problems combined do significantly compromise his ability to perform his normal work duties." Debtor's Exhibit 1 also included a letter dated February 12, 2001 from Thomas M. Hart, M.D., which stated that Debtor had "come under a significant amount of scrutinization [sic] due to the use of the narcotic analgesics, which he has been using for the last several years.... He has always remained on his evaluations as alert and oriented. There has never been any slurring of his speech, and again, no misuse identified." In addition, Debtor's Exhibit 1 included a March 20, 2001 letter to Dr. Hart from J. Zachary Mason, M.D., in which Dr. Mason stated:

> The patient has asked my opinion as to whether or not he could continue to work as a state trooper.... The immobility of his neck places him at a high risk for cervical injury in the course of his job as a state trooper. I don't recommend that he continue to work in this capacity due to the possible injury that could occur to his cervical spine should he be involved in a motor vehicle accident. He would have difficulty driving a car with his neck fused at the multiple levels as it is. Additionally, he is at a high risk for cervical injury should he become involved in an altercation.

Debtor currently receives retirement income from the Arkansas State Police. Trustee's Exhibit 1, a letter from the Arkansas State Police Retirement System, reflects that the amount of Debtor's monthly retirement income is $1,673.55. In addition to his retirement checks, Debtor receives Social Security Disability payments. Trustee's Exhibit 2, a letter from the Social Security Administration, reflects

that Debtor receives $1,378.00 per month in disability payments. Debtor's combined monthly income from his Arkansas State Police Retirement and Social Security Disability is $3,051.55.

Debtor testified that he and his wife have been divorced for a little over one year. Trustee's Exhibit 3, a custody, property settlement, and separation agreement filed June 30, 2000 in the Circuit Court of Garland County, Arkansas, granted Debtor's wife custody of their two children, provided that neither party would be required to pay child support to the other, and provided that Debtor would "provide all funds necessary to pay for the children's clothing, school and extracurricular expenses and activities, personal articles, and all other reasonable expenses necessary for their everyday needs." The agreement also required Debtor to "maintain major medical insurance through his present employer, the Arkansas State Police, covering the minor children ... [and] provide wife with full major medical insurance ... for a period of eighteen (18) months, ... ending February 1, 2002 ... at his sole and separate expense." In addition, the agreement provided that Debtor could count both children as dependents on his state and federal income tax returns so long as he met his obligations as set forth in the agreement. Debtor testified that both children are currently living with him, and that his son began college in the fall of 2000.

In addition to working for the Arkansas State Police, Debtor owned and operated B.R. Skipper, Inc., a construction business. Debtor testified that he has worked in construction since high school, and that he performed physical labor in connection with his construction business. His construction company is now out of business, and most of his construction tools were stolen from him by employees as he was in the process of finishing up his last few jobs. Joint Exhibit 3, the corporate tax returns from B.R. Skipper, Inc. for the years 1998, 1999, and 2000, reflect that in 1998, B.R. Skipper, Inc. had a total income of $22,938.00 and total deductions in the amount of $26,017.00, for a net loss of $3,079.00. In 1999, B.R. Skipper, Inc. had a total income of $55,084.00 and total deductions in the amount of $48,583.00 for a net income of $6,501.00. In 2000, B.R. Skipper, Inc. had a total income of $40,891.00 and total deductions in the amount of $43,866.00, for a total loss of $2,975.00.

Joint Exhibit 4 consists of Debtor's individual tax returns for the years 1998, 1999, and 2000. The 1999 tax returns were joint returns filed by Debtor and his wife. The tax returns reflect that in 1998, Debtor's gross wages, salaries, and tips, excluding his wife's income, were $45,561.00. In 1999, Debtor's gross wages, salaries, and tips, excluding his wife's income, were $47,446.00. In 2000, Debtor's gross wages, salaries, and tips were $45,208.00.

Debtor's Amended Schedule A, "Real Property," lists a home valued at $275,000.00. Debtor testified that he has not made payments on the house in several months and the house will be sold at auction, at which point he will obtain new housing. There is no evidence in the record to reflect Debtor's current housing expenses. Although Debtor is no longer making his house payment, he testified that he is paying utilities in the approximate amount of $300.00 to $400.00 per month. Debtor's other expenses include a telephone payment of $175.00 per month, which includes cellular telephones and three separate residential phone lines. Debtor testified that he is planning to disconnect one of the residential lines, that his parents pay for the cellular telephone used by his daughter, and that he esti-

mates that his telephone expenses will be approximately $40.00 per month in the future. Debtor estimates his food expenses to be $500.00 per month, his clothing expenses to be $250.00 per month, and his medical and dental expenses to be $300.00 per month. Pursuant to his divorce agreement, Debtor was paying $400.00 per month to insure his ex-wife, but that obligation expired in December 2001. Debtor drives a 2001 Chevrolet Silverado Z71 four wheel drive truck, which Debtor testified cost approximately $34,000.00. Joint Exhibit 1, a premium notice from Debtor's insurance company, reflects that Debtor's insurance on his truck costs $467.38 every six months. At the time Debtor filed bankruptcy, his son drove a 1998 Jeep Wrangler four wheel drive vehicle. Joint Exhibit 2 reflects that the insurance on Debtor's son's 1998 Jeep cost $1,726.31 every six months. Subsequent to Debtor's bankruptcy filing, Debtor's parents purchased a 2001 Jeep for Debtor's son. Debtor pays the insurance on his son's 2001 Jeep, and testified that it costs over $2,000.00 every six months to insure. Debtor testified that his son's insurance is expensive and going to go up because his son has been cited for driving under the influence. It is unclear from the evidence before the Court and from Debtor's testimony whether the current insurance premiums take his son's D.U.I. into account.

Debtor testified that he set up both the IRA and Valic Fund strictly to pay for his son's college education, and to be available in case of emergency.[1] The IRA was funded by contributions from Debtor, and the Valic Fund was funded solely by payroll deductions from Debtor's salary with the Arkansas State Police. Debtor has already withdrawn approximately $1,600.00 from one of the accounts to pay for his son's college tuition for the fall of 2001, and Debtor testified that he intends to continue to withdraw money from the accounts to pay for his son's college expenses.[2] Debtor wishes to exempt the full amount of the IRA and Valic Fund so that the money will be available to pay for his son's college expenses and any emergency costs that may arise.

III. *Conclusions of Law.*

The Trustee does not dispute that Debtor is entitled to exempt $8,925.00 of the IRA and Valic Fund pursuant to 11 U.S.C. § 522(d)(5). The only issue before the Court is whether Debtor is entitled to exempt the remaining value of the IRA and Valic Fund[3] pursuant to 11 U.S.C. § 522(d)(10)(E), which provides:

> (d) The following property may be exempted under subsection (b)(1) of this section:
>
> (10) The debtor's right to receive—
>
> (E) a payment under a stock bonus, pension, profitsharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—

---

1. In this case, the Court must determine the extent to which Debtor may access the corpus of the IRA and Valic Fund. Ordinarily, the best evidence of Debtor's rights under the accounts would be the actual account agreements. However, in this case, the actual agreements are no longer available. Therefore, the Court will base its findings of fact on the oral testimony of Debtor

2. The Trustee does not object to withdrawals so long as they do not exceed Debtor's § 522(d)(5) "wildcard exemption."

3. The documents in evidence reflect that the value of the IRA as of December 29, 2000 was $14,445.43 and the value of the Valic Fund as of December 31, 2000 was $5,528.51.

(i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's rights under such plan or contract arose;

(ii) such payment is on account of age or length of service; and

(iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986.

11 U.S.C. § 522(d)(10)(E). In interpreting § 522(d)(10)(E), the Court is mindful of the familiar principle that "exemption statutes must be construed liberally in favor of the debtor and in light of the purposes of the exemption." *In re Andersen,* 259 B.R. 687, 690 (8th Cir. BAP 2001) (citing *In re Wallerstedt,* 930 F.2d 630, 631 (8th Cir. 1991)). However, the liberal construction of exemption statutes is "for the purpose of achieving the legislative intent, not to 'extend the provisions of the legislative grant.'" *Eilbert v. Pelican (In re Eilbert),* 162 F.3d 523 (8th Cir.1998) (citations omitted). The purpose of exempting the right to payments under a pension, annuity, or similar plan is to "protect payments which function as wage substitutes after retirement." *Id.* The exemption is intended to protect payments that "support basic living requirements during the time of life when earning capacity is limited by age, disability, or illness." *Id.*

The Eighth Circuit Bankruptcy Appellate Panel has crafted a three prong test for the § 522(d)(10)(e) exemption. Specifically, the right to payment is exempt only to the extent the following conditions apply:

(1) they [the payments] are received pursuant to a "pension, annuity, or similar plan or contract,"

(2) "on account of illness, disability, death, age or length of service," and

(3) are reasonably necessary for the debtor's support or for the support of a dependent of the debtor.

*Id.* (citing generally to *Eilbert,* 162 F.3d at 527–28). Pursuant to Federal Rule of Bankruptcy Procedure 4003(c), the Trustee has the burden to demonstrate that the conditions of the exemption are not met. *Id.* If any of the conditions of the exemption are not met, Debtor may not claim the exemption. Because the Court has already heard evidence as to each of the three prongs of the § 522(d)(10)(e) exemption, the Court will issue conclusions of law as to each of the three prongs.

### A. Are the payments received pursuant to a pension, annuity, or similar plan or contract?

The Court must first determine whether the IRA and Valic Fund constitute pensions, annuities, or similar plans or contracts. *Id.* A pension, annuity, or similar plan or contract is "a contract to provide benefits in lieu of earnings after retirement, whether funded by the employer or purchased by the employee or the self-employed ... a plan created to fill or supplement a wage or a salary void." *Eilbert,* 162 F.3d at 527.

### 1. The IRA

Section 522(d)(10)(E), particularly as applied to IRAs that qualify for tax-exempt status under § 408 of the Internal Revenue Code, has been the subject of much judicial interpretation, and a significant amount of judicial consternation.[4] It seems the number of different judicial interpretations of the § 522(d)(10)(E) ex-

---

4. One court has described the language of § 522(d)(10)(E) as "seemingly irreconcilable" and requiring a navigation between the

" 'Scylla of rigid construction' and the 'Charybdis of meaninglessness.'" *In re Dale,* 252 B.R. 430, 432 (Bankr.W.D.Mich.2000).

emption is limited only to the number of courts that analyze the issue.

At least four of the circuit courts of appeals have reached the conclusion that "some—if not all—IRAs were intended to be included in the phrase 'similar plan or contract.'" *In re Carmichael,* 100 F.3d 375, 378 (5th Cir.1996); see also *In re Dubroff,* 119 F.3d 75 (2d Cir.1997); *In re McKown,* 203 F.3d 1188 (9th Cir.2000); *In re Brucher,* 243 F.3d 242 (6th Cir.2001). Although each of the four circuits employs a unique analysis of the issue, each of the four opinions contains a common thread-the notion that Congress's mention of Internal Revenue Code § 408 in subparagraph (d)(10)(E)(iii) compels a holding that Congress intended for IRAs to be included in the § 522(d)(10)(E) exemption.

The *Carmichael* court noted that subparagraph (d)(10)(E)(iii) "specifically denies exemption to those 'similar plans or contracts' that come within the proscription of (d)(10)(E)(i) and (d)(10)(E)(ii) and also fail to qualify under ... § 408." *Carmichael,* 100 F.3d at 378. The *Carmichael* court surmised that if IRAs are not "similar plans or contracts," "there would be no exempt § 408 plans or contracts from which ... § 408 plans or contracts could be exceptions." *Id.* The *Carmichael* court also proposed that IRAs should be included in the exemption because they are substitutes for future earnings; to hold otherwise would penalize self-employed individuals who chose to depend on IRAs for retirement; and "exempting IRAs comports with the very policy furthered by exemptions-providing the honest debtor with a fresh start" by "protecting a debtor's future income stream." *Id.*

The *Dubroff* court, interpreting a New York statute materially identical to § 522(d)(10)(E), rejected the proposition that its "initial task in interpreting [the exemption] is to determine whether an IRA is a 'similar plan or contract.'" *Dubroff,* 119 F.3d at 77. The court reasoned that "if [it] were to do so and reach the conclusion that an IRA was not a 'similar plan or contract,' [subparagraph (iii)] would become surplusage." *Id.*

The *McKown* court, citing *Carmichael* and *Dubroff,* posed the rhetorical question "[w]hy would Congress talk about IRAs in the exception unless it included IRAs in the rule?" *McKown,* 203 F.3d at 1190. The court concluded that "[Congress] would not. ... There could be no reason for legislators to exclude non-qualifying IRAs from the exemption, as the exception does, unless they intended that qualifying IRAs could be exempt." *Id.*

The most recent circuit court decision on the issue, *Brucher,* essentially follows the reasoning set forth in *Carmichael.* The *Brucher* court determined that "[i]f IRAs were never to be exempted under § 522(d)(10)(E), the inclusion in subsection (iii) of the reference to section 408 would have been utterly pointless." *Brucher,* 243 F.3d at 243.

Debtor urges the Court to follow the reasoning set forth in *Carmichael, Dubroff, McKown,* and *Brucher,* and hold that Debtor's IRA is a "similar plan or contract" under § 522(d)(10)(E). However, for the Court to so hold, it would have to ignore considerable Eighth Circuit precedent.

The Eighth Circuit first interpreted the phrase "similar plan or contract" in *Huebner v. Farmers State Bank (In re Huebner),* 986 F.2d 1222 (8th Cir.1993). In *Huebner,* the issue before the court was whether the debtor could claim an exemption in two flexible premium annuities. Both annuities qualified as IRAs under § 408 of the Internal Revenue Code. *Huebner,* 986 F.2d at 1224. The exemption issue was analyzed under an Iowa statute,

as Iowa has opted out of the federal exemption scheme. The Iowa statute at issue was materially similar to § 522(d)(10)(E), allowing debtor to exempt the right to payment under "a pension, annuity, or similar plan or contract on account of illness, disability, death, age or length of service." *Id.* The Eighth Circuit later described the Iowa statute as "nearly identical" to and "borrowed from" § 522(d)(10)(E).[5]

The debtor in *Huebner* had "the unfettered discretion to receive payments at any time ... subject only to relatively modest penalties for withdrawals before age 59 1/2." *Id.* The court determined that debtor's "access to and complete control over the timing of the annuity payments mean[s] that any payments received under the contracts would not be 'on account of' his age." *Id.* Accordingly, the court determined that the IRAs were not "similar plans or contracts." In so holding, the court observed that the debtor "could have invested his savings in retirement annuities that prevented him from withdrawing funds prior to his reaching retirement age, in which event retirement payments under those annuities would have been exempt." *Id.* Instead of choosing that option, the debtor "decided to invest in annuities that place virtually no restrictions on his right to withdraw." *Id.* The court found that "[s]uch assets are essentially 'bank savings accounts' with favorable tax treatment." *Id.*

The Eighth Circuit Bankruptcy Appellate Panel (the "B.A.P") analyzed the "similar plan or contract" language of the Iowa statute in *Eilbert v. Pelican (In re Eilbert),* 212 B.R. 954 (8th Cir. BAP 1997). The B.A.P. identified four factors a court may use to aid its determination of whether a particular annuity is a "similar plan or contract." First, a court may consider whether the debtor made contributions to the annuity over time. *Id.* at 958–59. Second, a court may consider whether the investment was purchased in isolation, or whether it included contributions by others. *Id.* at 959. Third, a court may look to the debtor's return on an investment. *Id.* Finally, a court may consider the extent to which the debtor may control the annuity. The court held that "if the debtor has complete discretion to withdraw the entire corpus, then the contract resembles a non-exempt investment." *Id.* The final factor was apparently conclusive to the B.A.P. Because the debtor "enjoyed unfettered discretion to liquidate the corpus at any time, subject only to contractual penalties assessed against principal," the B.A.P. determined that the annuity was not a "similar plan or contract." *Id.* at 959–60. In addition, the B.A.P. stated that "[a] contractual or tax penalty is not necessarily a limitation on withdrawal." *Id.* at 959.

The B.A.P. decision was affirmed by the Eighth Circuit. *Eilbert v. Pelican (In re Eilbert),* 162 F.3d 523 (8th Cir.1998). In affirming the B.A.P.'s decision, the court stated that "similar plan or contract" includes within the exemption "retirement plans or investments that are 'created to fill or supplement a wage or salary void.'" *Eilbert,* 162 F.3d at 527. Because the debtor's annuity did not replace lost income, was not purchased with contributions over time as part of a long term retirement strategy, and was purchased as a pre-bankruptcy planning measure, the court determined that the annuity was not a "similar plan or contract" included within the exemption. *Id.*

The B.A.P recently re-visited the "similar plan or contract" issue in *Andersen v.*

**5.** The Court recognizes that the Iowa statute lacked the internal reference to § 408 that influenced the holdings in *Carmichael, Dubroff, McKown,* and *Brucher.*

*Ries (In re Andersen)*, 259 B.R. 687 (8th Cir. BAP 2001). In *Andersen*, the debtor used a $40,000.00 inheritance to purchase an annuity in lieu of a retirement plan. *Andersen*, 259 B.R. at 689. Before reaching retirement age, and before filing bankruptcy, the debtor made the required election on the annuity to state the date on which she would begin receiving payments. *Id.* Upon making the election, the debtor lost the discretion to withdraw, settle, or surrender the corpus of the annuity. *Id.* At the time she filed bankruptcy, the debtor was retired and receiving monthly annuity payments. *Id.*

In *Andersen*, the B.A.P. looked to the analysis performed in *Eilbert*, and stated that "numerous factors may be considered" in determining whether an annuity is a "similar plan or contract." As in *Eilbert*, the B.A.P. stated that specific queries may include:

 * Were the payments designed or intended to be a wage substitute?

 * Were the contributions made over time? The longer the period of investment, the more likely the investment falls within the ambit of the statute and is the result of a long standing retirement strategy, not merely a recent change in the nature of the asset.

 * Do multiple contributors exist? Investments purchased in isolation, outside the context of workplace contributions, may be less likely to qualify as exempt.

 * What is the return on investment? An investment which returns only the initial contribution with earned interest or income is more likely to be a nonexempt investment. In contrast, investments which compute payments based upon the participant's estimated life span, but which terminate upon the participant's death or the actual life span, are akin to a retirement investment plan. That is, will the debtor enjoy a windfall if she outlives her life expectancy? Is she penalized if she dies prematurely?

 * What control may the debtor exercise over the asset? If the debtor has discretion to withdraw from the corpus, then the contract most closely resembles a nonexempt investment.

 FN1. This was the obstacle that the debtor in *Huebner v. Farmers State Bank (In re Huebner)*, 986 F.2d 1222 (8th Cir.), *cert. denied*, 510 U.S. 900, 114 S.Ct. 272, 126 L.Ed.2d 223 (1993) could not overcome.

*Andersen*, 259 B.R. at 691.

The Eighth Circuit's analysis of the "similar plan or contract" issue stands in stark contrast to the *Carmichael, Dubroff, McKown*, and *Brucher* holdings, each of which suggests that IRAs fall within the "similar plan or contract" language *per se.* This Court is bound to follow the precedent of the Eighth Circuit.[6] Moreover, this Court is convinced that the Eighth Circuit analysis is the better rule of law.

The rule adopted in *Carmichael, Dubroff, McKown*, and *Brucher* (the "Per Se Exemption") requires leaps of statutory construction that this Court is not willing to make. The courts that have adopted the Per Se Exemption argue that holding otherwise would render the mention of § 408 in subparagraph (d)(10)(E)(iii) of § 522 surplusage. However, this Court believes that adopting a Per Se Exemption of IRAs would render the "similar plan or

---

6. None of the Eighth Circuit cases cited herein involve both the federal § 522(d)(10)(E) exemption and a § 408 IRA. Nonetheless, the Court finds no indication in the Eighth Circuit opinions that the court would forego its analysis of the "similar plan or contract" requirement merely because subparagraph (iii) of § 522(d)(10)(E) mentions § 408.

contract" language of paragraph (d)(10)(E) surplusage in cases involving IRAs.[7]

This Court, like another court that researched the issue, "cannot find anything within the Bankruptcy Code or the legislative history which manifests a Congressional intent to exempt retirement plans in toto." *In re Dale,* 252 B.R. 430, 434 (Bankr.W.D.Mich.2000). In fact, the evidence is quite to the contrary. If Congress intended to enact a Per Se Exemption of § 408 IRAs, it could have done so by simply stating that "a right to receive payment from an individual retirement annuity qualified for tax exempt status under 26 U.S.C. § 408 shall be exempt." In the absence of such a specific enactment, the Court refuses to infer that Congress manifested any such intent by mentioning § 408 in subparagraph (iii) of § 522(d)(10)(E).

 Statutory provisions, such as subparagraph (d)(10)(E)(iii), must be construed *in pari materia,* that is, in reference to one another. *In re Zott,* 225 B.R. 160, 167 (Bankr.E.D.Mich.1998). Statutory language must be evaluated in context, and the Supreme Court has observed that the plain meaning a court should attempt to discern is the plain meaning of the whole statute, not of isolated sentences. *Beecham v. United States,* 511 U.S. 368, 372, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994). Courts should avoid interpretations that render statutory terms as surplusage. *Babbitt v. Sweet Home Chapter of Communities for a Great Or.,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). If at all possible, courts should strive to read the provisions of a statute as harmonious with each other.

The Court concludes that the most harmonious interpretation of § 522(d)(10)(E) is that Congress intended to exempt § 408 IRAs to the extent they are "similar plans or contracts"; payable "on account of illness, disability, death, age or length of service"; and "reasonably necessary for the support of the debtor and any dependent of the debtor." This interpretation gives meaning to the requirements of paragraph (d)(10)(E), without ignoring the mention of § 408 in subparagraph (d)(10)(iii). Under this interpretation, no part of the statute is surplusage.[8]

---

7. Moreover, the Court perceives an inconsistency in the manner the *Carmichael* court applied the Per Se Exemption. Specifically, the *Carmichael* court dispensed of the "similar plan or contract" and "on account of illness, disability, death, age, or length of service" requirements of paragraph (d)(10)(E), but nonetheless imposed the "reasonable necessary for the support of the debtor and any dependent of the debtor" requirement of (d)(10)(E). If the *Carmichael* court determined that (d)(10)(E)(iii) requires the exemption of IRAs *per se,* then all IRAs, even those not reasonably necessary for support, should be exempt. The Court does not believe that Congress intended such a result.

8. One might argue that this interpretation renders IRAs, as they exist today, non-exemptible *de facto* because IRAs are standardized agreements, allowing for preset payment with a tax penalty imposed for withdrawal before age 59 1/2. Therefore, it may be that few, if any, IRAs meet the "on account of" requirement. In fact, one court has held that IRAs, as they exist today, are non-exempt *per se* under § 522(d)(10)(E). *In re Zott,* 225 B.R. at 168. However, this Court finds no reason why IRAs that meet the "on account of" requirement cannot be drafted. There is nothing in the Internal Revenue Code or tax regulations to prevent a person from including a spendthrift provision in his IRA contract that takes away discretion to access the corpus of the account. *Id.* If, as the *Zott* court believed, it is "unlikely" that individuals would insist on such a provision, and if Congress determines that all IRAs should be exempt, then Congress should amend § 522 to exempt all IRAs. The Court must assiduously avoid the temptation to "fix" statutes. *In re Widdicombe,* 269 B.R. 803, 807 (Bankr.W.D.Ark.2001).

■ The Court will analyze whether the IRA in this case is a "similar plan or contract." The list of possible factors outlined by the Eighth Circuit B.A.P. in *Eilbert* and *Andersen* is not all-inclusive, nor is there any requirement that the Court go through each of the factors. The primary purpose of the factors is to determine whether the annuity was purchased with the intent to provide benefits in lieu of earnings after retirement or to fill or supplement a wage or salary void. In this case, it is clear from the evidence before the Court that Debtor did not intend the IRA to be a wage substitute. Debtor testified that his purpose in setting up the IRA was to create a savings account to pay for his son's college education. In addition, Debtor testified that if the Court finds that his IRA is exempt, he intends to withdraw the money to pay for his son's education. There is no evidence in the record that Debtor ever intended, or now intends, for the IRA to provide an income stream in lieu of retirement. This evidence alone is sufficient to support a finding that Debtor's IRA is not a "similar plan or contract" within the meaning of § 522(d)(10)(E). Moreover, based on Debtor's testimony that he has already withdrawn money from the IRA or Valic Fund, and his testimony that he intends to continue to withdraw funds if the accounts qualify for an exemption, the Court concludes that Debtor has discretion to withdraw from the corpus of the accounts. The Eighth Circuit has held that an IRA is not a "similar plan or contract" where the debtor has unfettered discretion to withdraw from the corpus. *Huebner*, 986 F.2d at 1222. The Court concludes that Debtor's IRA is not a "similar plan or contract" within the meaning of § 522(d)(10)(E), and

is not entitled to an exemption pursuant to that section.

*2. The Valic Fund.*

The Court's analysis of whether Debtor's Valic Fund is a "similar plan or contract" is essentially the same as its analysis of Debtor's IRA, except that it is not complicated by the reference in subparagraph (d)(10)(E)(iii) to § 408 because there is no evidence in the record that the Valic Fund is a § 408 IRA. Like the IRA, Debtor set up the Valic Fund as a savings account to pay for his son's college education. Debtor has already made one withdrawal from the corpus of the IRA or Valic Fund, and Debtor testified that if the Court finds the Valic Fund to be exempt, Debtor intends to make future withdrawals in order to pay for his son's college education. The evidence before the Court is clear that the Valic Fund was not intended to be a wage substitute. Rather, it is simply a savings account. The Court concludes that the Valic Fund is not a "similar plan or contract" within the meaning of § 522(d)(10)(E), and is not entitled to an exemption pursuant to that section.

B. *Are the payments on account of illness, disability, death, age, or length of service?*

■ The Court's conclusion that the IRA and Valic Fund are not "similar plans or contracts" is sufficient to sustain the Trustee's objections to exemptions. However, because the Court has heard evidence as to whether the right to payment under Debtor's IRA and Valic Fund is triggered by illness, disability, death, age or length of service, the Court will also issue findings on that issue.[9] The Eighth

9. Other courts have disregarded this requirement with regard to § 408 IRAs. See *Brucher*, 243 F.3d at 244. For the reasons set forth previously in this opinion, this Court will ad-

here to Eighth Circuit precedent and give meaning to all of the requirements of § 522(d)(10)(E).

Circuit has held that in order for an annuity to qualify for the exemption, "the debtor may not have access to or control over the timing of the annuity payments." *Huebner*, 986 F.2d at 1225; see also *Eilbert*, 162 F.3d at 527; *Andersen*, 259 B.R. at 693. Access to and control over the timing of annuity payments mean that any payments received are not "on account of age." *Id.* The ten percent federal tax penalty imposed on early withdrawals from a § 408 IRA has been described by the Eighth Circuit as "relatively modest," and does not constitute a restriction on the right to withdraw. *Id.*

In this case, the evidence before the Court is that Debtor has withdrawn approximately $1,600.00 from either the IRA or Valic Fund subsequent to his bankruptcy filing, and that he intends to continue to do so in the future. The Court concludes that Debtor's right to payment under the IRA and Valic Fund is not on account of illness, disability, death, age, or length of service. Consequently, neither the IRA or Valic Fund is entitled to an exemption under § 522(d)(10)(E).

C. *Are the payments reasonably necessary for the support of the debtor or a dependent?*

 Because the Court has heard evidence on the issue, the Court will also issue findings as to whether Debtor's right to payments under the IRA and Valic Fund are reasonably necessary for the support of Debtor or his dependents. There is no statutory definition of "reasonably necessary for support." Rather, courts analyze the issue on a case-by-case basis. *In re Sisco*, 147 B.R. 495, 496 (Bankr.W.D.Ark.1992). Arkansas cases define "support" as the necessities of life, including a reasonably furnished home. *Evans v. Evans*, 263 Ark. 291, 564 S.W.2d 505 (1978). Some factors typically employed by bankruptcy courts include the following:

(1) Debtor's present and anticipated living expenses;

(2) Debtor's present and anticipated income from all sources;

(3) Age of the debtor and dependents;

(4) Health of the debtor and dependents;

(5) Debtor's ability to work and earn a living;

(6) Debtor's job skills, training, and education;

(7) Debtor's other assets, including exempt assets;

(8) Liquidity of other assets;

(9) Debtor's ability to save for retirement;

(10) Special needs of the debtor and dependents;

(11) Debtor's financial obligations, e.g., alimony or support payments.

*Sisco*, 147 B.R. at 497; *In re Savage*, 248 B.R. 573 (Bankr.E.D.Ark.2000).

 If Debtor intended to use the IRA and the Valic Fund as a wage substitute, most of the factors listed above would weigh in favor of granting an exemption of the accounts. The Court heard evidence indicating that Debtor's ability to earn future income and save for retirement is compromised by his medical condition, and Debtor's expenses are significant. However, in this case Debtor testified that he intends to use the funds in the IRA and Valic Fund to pay for his son's college education. Accordingly, the issue before the Court is whether a college education is a necessity of life. Although Debtor's desire to provide his son with a college education is admirable, the Court cannot hold that a college education is a necessity of life. Moreover, Debtor's son is eighteen years of age and capable of working or obtaining a loan to help pay for his college

education. The record also reflects that Debtor's son is driving a 2001 Jeep purchased for him by his grandparents, and that Debtor is paying at least $4,000.00 per year for insurance on that vehicle. The Court cannot find that the IRA and Valic Fund are reasonably necessary for the support of Debtor or a dependant in light of the amount of his budget that Debtor has allocated to car insurance. Finally, allowing an exemption in this case would be contrary to the underlying policy of § 522(d)(10)(E), which Congress intended to protect streams of income that amount to wage substitutes. In this case, Debtor's IRA and Valic Fund are merely savings accounts that he wishes to access to pay for his son's education. The IRA and Valic Fund are not intended as streams of income that amount to wage substitutes. Consequently, neither the IRA or Valic Fund is entitled to an exemption under § 522(d)(10)(E).

IV. *Conclusion.*

Neither the IRA or the Valic Fund meets the requirements of § 522(d)(10)(E). Accordingly, the Court finds that Debtor is not entitled to claim exemptions pursuant to that section. The Trustee's objection to exemptions and objection to amended exemptions are hereby SUSTAINED and the Trustee's motion for turnover is hereby GRANTED, provided that Debtor is entitled to his "wildcard exemption" of $8,925.00 in the IRA and Valic Fund pursuant to § 522(d)(5).

IT IS SO ORDERED